UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| KIMBERLY MCCLAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:07-CV-113-JVB |
| | ) |
| TP ORTHODONTICS and | ) |
| CASSIA CAMPOY, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Plaintiff Kimberly McClain filed this suit against her former employer and supervisor, Defendants TP Orthodontics and Cassia Campoy. Plaintiff claims that she was sexually harassed when Cassia Campoy requested that Plaintiff sleep with Campoy's ex-husband. Plaintiff contends that she was subjected to a hostile work environment in violation of Title VII; she claims that because she declined Campoy's requests, Campoy subjected her to continuous verbal abuse and ultimately, orchestrated her firing.

Plaintiff also alleges the following state law claims: intentional infliction of emotional distress, defamation, tortious interference with a contract, and negligent retention. Defendants moved for summary judgment, and the Court will now address the motion.

**A. Motion for Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of

the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

**B. Statement of Facts and Procedural Background**

Defendant TP Orthodontics manufactures and sells orthodontic products worldwide. Its headquarters are in LaPorte, Indiana. In 1999, TP Orthodontics hired Brazilian-born Cassia Campoy as general manager for TP Brazil, a subsidiary of TP Orthodontics. After working for TP Orthodontics in Brazil, Campoy was transferred to LaPorte in March 2004, where she became the interim sales manager and eventually sales director. TP Orthodontics also hired Campoy's husband, Evandro Coelho, as a laboratory service manager. As the interim sales manager, Campoy reported to Sandy Hoefer, the director of marketing. Campoy was responsible for sales in the United States and hiring a new sales team.

On February 21, 2005, Campoy hired Plaintiff Kimberly McClain as an orthodontic sales representative. Although Plaintiff had no previous sales experience, she had an associate's degree in dental laboratory technology and experience working in the dental industry. Plaintiff's sales territory was Missouri and central to southern Illinois. Plaintiff's primary responsibilities included: making sales calls to doctors in her territory; traveling to meet with doctors in her territory; informing doctors of new products; processing sales orders; and developing and maintaining business. Additionally, TP Orthodontics required Plaintiff and all other sales representatives to track their sales calls on a software system called Client Management Systems (CMS).

At the time of her hire, Plaintiff had two supervisors. The first was Cassia Campoy. Campoy oversaw Plaintiff's sales numbers and overall performance and was a disciplinary authority. The second was Theresa Swanson, the customer service manager. Swanson supervised Plaintiff's sales administrative functions, including her CMS entries.

Plaintiff initially developed good relationships with all of her coworkers and supervisors. She became friends with Campoy and several female sales representatives, particularly Mary Frazee and Heidi Cheslek. (Pl.'s Dep. at 67 & 107.) Likewise, Campoy befriended Cheslek and wanted to be closer friends with Frazee. (Cheslek Dep. at 55–56.) Plaintiff, Campoy, and the other sales representatives would meet outside of work for dinner and to celebrate birthdays. They discussed attending ballroom dancing lessons together to stay active in the winter. "[T]here was a closeness" among the group. (Cheslek Dep. at 59.)

During Plaintiff's employment at TP Orthodontics, her supervisors took issue with her unsatisfactory CMS documentation. On July 6, 2005, Campoy sent an email to sales representatives, including Plaintiff, stressing that sales representatives were required to document all their sales calls. On August 16, 2005, Campoy sent another email to Plaintiff and the sales team. The email again warned sales representatives that documenting their calls was required. Campoy warned the sales team that failure to document calls using CMS has and could result in termination.

Throughout Plaintiff's employment at TP Orthodontics, Campoy was experiencing marital difficulties, largely due to Coelho's infidelities. Campoy separated from Coelho in March 2005 and divorced him in July 2005. During and after the divorce proceedings, Coelho would harass and threaten Campoy.

On Thursday, October 6, 2005, during a yearly meeting in the lunchroom with doctors from around the country, Campoy told Plaintiff and other members of the sales department that Coelho was harassing her. In response, Plaintiff advised Campoy to call the police and pursue a charge of harassment. Campoy walked away but later returned. When she returned, Campoy asked Plaintiff to go out to dinner with Coelho so that he would leave Campoy alone. Plaintiff said no, left the lunchroom, and went down to the salesroom. In the salesroom, Plaintiff met Mary Frazee, and they walked outside for their break. Campoy and Peter Severson, a sales employee, followed them outside. Outside at a picnic table, Campoy asked Frazee to persuade Plaintiff to go out with Coelho. Campoy commented to the group that Coelho was great in bed and that Plaintiff would enjoy it. Frazee shook her head and responded, "Absolutely not." (Frazee Dep. at 23.) Campoy then looked at Severson and stated that she would bet him $10 that she could get Plaintiff to sleep with Coelho. Severson did not respond. After the break, the group returned inside to work. Plaintiff felt humiliated and avoided Campoy for the rest of the day.

The next day, Plaintiff was outside with Frazee and Sandy Hoefer, Campoy's supervisor. Again, Campoy approached Plaintiff with the offer to sleep with Coelho. Campoy told the group that she would pay Plaintiff to sleep with Coelho and that everyone had a price. Plaintiff said no. Hoefer asked Campoy why she would want Plaintiff to sleep with Coelho. Campoy responded that Plaintiff was a tough girl and could handle it. Another coworker, Nicole Baker, approached the group and asked what was being discussed. Campoy informed Baker that she wanted Plaintiff to sleep with Coelho, and she asked Baker to help. Baker declined.

On Monday, October 10, 2005, Campoy's offer was still on the table. While Plaintiff was working in the salesroom with the sales team, Campoy walked in and announced that everyone should help her persuade Plaintiff to sleep with Coelho. Campoy stated that Plaintiff should sleep with Coelho because she was Campoy's friend and an "all-American woman." (Pl.'s Dep. at 107.) Campoy said that she wanted to get back at Coelho and have someone hurt him as much as he hurt her. Campoy again emphasized that Coelho was great in bed and that she would pay Plaintiff if she would just name her price. In response, Frazee stated that what Campoy said was on a need-to-know basis and that they didn't need to know. After Campoy left the room, several members of the sales team expressed disbelief concerning what Campoy said.

Campoy remained persistent later in the day. During lunch, Campoy told Plaintiff that she would get her checkbook if Plaintiff told her how much she wanted to sleep with Coelho. Plaintiff ignored the comment. Later during the break, in front of several coworkers, Campoy asked Plaintiff again. Plaintiff responded, "No, nothing's changed, Cassia." (Pl.'s Dep. at 118.)

Although Plaintiff never reported Campoy's statements to human resources, she told Campoy's supervisor, Sandy Hoefer, that Campoy's comments "made [her] ill." (Pl.'s Dep. at 122.) In response, Hoefer told Plaintiff to let it go for a couple days. After October 10, 2005, Campoy did not make any further comments to Plaintiff about Coelho. Several weeks later, Campoy attended Plaintiff's birthday party outside of work without incident. (Cheslek Dep. at 59; Campoy Aff. ¶ 15 & Ex. 4.)

However, Plaintiff's coworker, Heidi Cheslek, saw a sudden change in Campoy's attitude toward Plaintiff after the birthday party. At the end of October 2005, Campoy

and Cheslek went on a business trip together to Bermuda. At one point during the trip, Campoy brought up Plaintiff in conversation. Campoy stated that Plaintiff was "no good" and that "she wasn't a good mother" because she allowed her children to live with her ex-husband after a divorce. (Def.'s Statement of Material Facts ¶ 118.) In response, Cheslek defended Plaintiff, stating that she was a good mother. According to Cheslek, Campoy's attitude toward Plaintiff changed point blank, as if "she was her worst enemy." (Cheslek Dep. at 59.)

Campoy's hostility toward Plaintiff became more prevalent in November. On November 29, 2005, Campoy, Severson, and Swanson held a meeting with Plaintiff to discipline her for insufficient CMS documentation. Campoy yelled at Plaintiff and told her that if she continued to document her CMS entries insufficiently, she would have to fire her. After the meeting, as Plaintiff gathered her things to leave the room, Campoy stated that Plaintiff was a tougher woman than she anticipated. Plaintiff responded by asking Campoy what she meant. Campoy stated that most women, after receiving "an ass-chewing like I just gave you" would break down and cry. (Pl.'s Dep. at 125.) Campoy said that she wanted to know what would make Plaintiff cry.

In the months following Plaintiff's disciplinary meeting, Campoy displayed similar hostility toward Plaintiff in meetings. During one meeting with the sales team, Campoy asked Plaintiff why she thought TP Orthodontics did not sell more lab products. Plaintiff responded that the products were overpriced. Campoy replied that Plaintiff did not "know what the hell [she] was talking about," and Campoy asked her "what made [her] such an expert in dentistry." (Pl.'s Dep. at 128.) When Plaintiff responded that she

7

had a degree in dental laboratory technology, Campoy stated, "What the hell makes you think that you're so right?" (Pl.'s Dep. at 128.)

In another meeting with the sales team, Campoy was discussing a new strategy where sales representatives would only target the top fifty doctors in their respective sales territories. Plaintiff questioned the strategy. In front of the sales team and Swanson, Campoy turned to Plaintiff and yelled, "Why do you have to be so fucking negative?" (Pl.'s Dep. at 131.) As Plaintiff attempted to respond, Campoy yelled, "Did I tell you to talk to me? Did I tell you to talk to me? No." (Pl.'s Dep. at 131.) Swanson attempted to defend Plaintiff, but Campoy told her to be quiet and to stop defending her. Another coworker, Patty Carr, spoke up to defend Plaintiff's statement. After Carr was through, Campoy turned to Plaintiff and said, "Lay by the fucking pool. I don't care." (Pl.'s Dep. at 131.)

Another incident occurred on December 7, 2005. While working on the road in Kansas City, Plaintiff received a phone call from TP Orthodontics' top client, Dr. Goldberg. Dr. Goldberg called Plaintiff to request special pricing on a product. To look into Dr. Goldberg's request, Plaintiff called Theresa Swanson, Peter Severson, and Campoy. After leaving messages with each, she did not receive a response. So Plaintiff called Sandy Hoefer. Hoefer told her that she would have to get back to her. Later in the day, Plaintiff received a call from Campoy. Campoy told Plaintiff that if she ever went "over her fucking head again," she would have her job. (Pl.'s Dep. at 140.) Campoy stated, "Kim, why don't you just save me the time and quit. Quit your job now." (Pl.'s Dep. at 140.) According to Plaintiff, Campoy's requests for Plaintiff to quit were frequent.

As a result of this conversation with Campoy, Plaintiff contacted the Equal Employment Opportunity Commission (EEOC). The EEOC directed Plaintiff to contact the Michigan City Human Rights Commission. Plaintiff contacted the Commission and set up an appointment for later in December. However, Plaintiff did not keep the appointment. She decided that it would be best not to upset anyone in the office during the holidays. Plaintiff thought that Campoy's hostility toward her would stop if she kept a low profile. It did not. Rather, Campoy's hostility toward Plaintiff became so prevalent that customer service employees would refer to Campoy as the "Tasmanian Devil." (Pl.'s Dep. at 158.) Plaintiff became known as "Cassia's Whipping Post." (Pl.'s Dep. at 130.)

According to Plaintiff, she was humiliated by Campoy's frequent verbal abuse in the presence of coworkers. She would leave sales meetings and go to the bathroom to cry. Although Plaintiff claimed that Campoy's hostility did not affect her sales, Campoy made Plaintiff question herself as a person, her knowledge of the dental industry, and her ability as an employee.

Plaintiff also saw Campoy yell and humiliate other coworkers. Campoy would scream at Candace Hunsley, a customer service employee, when she made mistakes and, on at least one occasion, made Hunsley cry. She would also belittle employees Kris Stone, Nicole Baker, and Lily Ng. Campoy would even "pass the buck" and blame Rosco, a male coworker, when she did not finish reports in time for meetings. (Pl.'s Dep. at 159.)

In February 2006, Theresa Swanson conducted a yearly salary review for Plaintiff and Heidi Cheslek. The potential increase in compensation was subject to their performance. Considering both Plaintiff's and Cheslek's sales performances to be

9

unsatisfactory, Swanson sent an email to Campoy on February 23, 2006. Swanson asked Campoy whether she wanted to extend Plaintiff's and Cheslek's salary reviews for three months or whether their employment would be terminated. Later in the day, Campoy responded in an email stating that she wanted to extend the salary reviews for three months.

However, Campoy was later informed that Plaintiff's CMS documentation was still inadequate despite repeated warnings. As a result, Campoy and Peter Severson decided to terminate Plaintiff's employment.

On March 15, 2006, Human Resources Director John Skierkowski called Plaintiff into his office. When Plaintiff walked in, she saw both Skierkowski and Campoy. Campoy told Plaintiff that she was not meeting company standards and that she was being terminated. Campoy then left the room. Plaintiff told Skierkowski that she thought she was called into his office to discuss a complaint she made against TP Orthodontics on March 6 during a meeting with the Michigan City Human Rights Commission. In response, Skierkowski gave Plaintiff a copy of the TP Orthodontics sexual harassment policy to give to the EEOC and her attorney. Skierkowski then escorted Plaintiff to her desk to gather her belongings and then out of the building.

Plaintiff's charge of discrimination with the Michigan City Human Rights Commission was signed and filed by Plaintiff on March 17, 2006, and received by the Indianapolis District Office of the EEOC on March 22, 2006. Plaintiff alleged that Campoy asked her to sleep with Coelho on several occasions. Plaintiff claimed that after she refused Campoy's requests, Campoy repeatedly harassed her, threatened to fire her,

and orchestrated her termination. Plaintiff asserted that her rights under Title VII of the Civil Rights Act were violated because she was subjected to a hostile work environment.

On December 20, 2006, the EEOC issued a notice of dismissal to Plaintiff. The notice stated that the EEOC was unable to conclude that the information obtained through its investigation established a violation of Title VII. The notice also informed Plaintiff of her right to sue under federal law within ninety days of receiving the notice.

On March 19, 2007, Plaintiff filed a complaint in this Court against TP Orthodontics and Cassia Campoy alleging the following claims: (1) exposure to a hostile work environment in violation of Title VII of the Civil Rights Act; (2) tortious interference with a contract; (3) intentional infliction of emotional distress; (4) negligent retention; and (5) defamation. Plaintiff seeks compensatory and punitive damages, interest, reinstatement to her position with TP Orthodontics or future lost wages, and costs. Defendants moved for summary judgment on September 30, 2008. On June 29, 2009, the Court set a hearing date of July 17, 2009, for oral argument on the Defendants' motion for summary judgment, in light of a Proposed Opinion and Order issued to the parties.

On July 16, 2009, Plaintiff filed an affidavit in opposition to Defendants' motion for summary judgment and moved to request that Defendants file the full deposition of Heidi Cheslek. After hearing oral arguments on July 17, 2009, the Court granted Plaintiff's motion and ordered Defendants to file the full deposition of Heidi Cheslek.

## C. Discussion

**(1)** *Title VII: Hostile Work Environment*

Title VII prohibits employers from discharging or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is well established that an employer's sexual discrimination that alters an employee's conditions of employment in a way that creates a hostile or abusive work environment violates Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To make a prima facie case of sexual harassment on the basis of a hostile work environment, a plaintiff must demonstrate that: (1) she was subject to unwelcome sexual advances, requests for sexual favors, or other verbal or physical sexual conduct; (2) the conduct was directed at her because of her sex; (3) the conduct was severe or pervasive enough that it created a hostile work environment; and (4) there is a basis for employer liability. *Quantock v. Shared Mktg. Services, Inc.*, 312 F.3d 899, 903 (7th Cir. 2002).

The Court concludes that a genuine issue of material fact exists concerning whether Campoy's hostility and verbal abuse toward Plaintiff occurred because she refused Campoy's requests to sleep with Coelho—thus, occurring because of Plaintiff's sex. Therefore, Defendant is not entitled to summary judgment on Plaintiff's Title VII hostile work environment claim.

**(2)** *Tortious Interference with a Contract*

Indiana law recognizes the principle that a person's contract rights are entitled to protection, in certain circumstances, from those who tortiously interfere with such rights. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994) (citing *Miller v. Ortman*, 136 N.E.2d 17, 34 (Ind. 1956)). To establish a claim for tortious interference

with a contract, a plaintiff must prove: (1) the existence of an enforceable and legitimate contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of breach of the contract; (4) a lack of justification; and (5) damages caused by the defendant's inducement of the breach. *Id.* at 1235 (citing *Daily v. Nau*, 339 N.E.2d 71 (Ind. Ct. App. 1975)). Tortious interference with a contract is actionable even if the employment is at will. *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n.*, 571 N.E.2d 282, 284 (Ind. 1991).

However, an action for tortious interference with a contract cannot be made against a party to the contract. *Martin v. Platt*, 386 N.E.2d 1026 (Ind. Ct. App. 1979). In *Martin*, the plaintiffs reported to a company officer that their direct supervisor was soliciting and receiving kickbacks from suppliers. After the officer investigated the plaintiffs' claims, the officer fired the plaintiffs. The plaintiffs sued the company, officer, and supervisor for tortious interference. The court held that the plaintiffs could not maintain their cause of action because the officer and supervisor's decision to fire them was within the scope of their employment and on behalf of the company, a party to the plaintiffs' employment contracts. *Id.* at 690–91.

In 2008, an Indiana court of appeals reaffirmed this rule; however, the court noted that a party to a contract "may be subject to liability for conspiring with another party to tortiously interfere with [an employment] contract." *Allison v. Union Hospital, Inc.*, 883 N.E.2d 113, 118 (Ind. Ct. App. 2008).

Plaintiff was an at will employee of TP Orthodontics. It is undisputed that Campoy was, at all times, one of Plaintiff's supervisors and as such, possessed the authority to terminate Plaintiff's employment. In firing Plaintiff, Campoy acted within

13

the scope of her employment and on behalf of TP Orthodontics—a party to Plaintiff's employment agreement. Plaintiff has not put forth evidence or even alleged that Campoy conspired with another party to fire Plaintiff. Rather, Plaintiff only asserts that Campoy orchestrated Plaintiff's termination.

Therefore, a cause of action against Campoy for tortious interference cannot be maintained, and Defendant is entitled to judgment as a matter of law on this claim.

### (3) *Intentional Infliction of Emotional Distress*

Plaintiff also claims that Campoy intentionally caused her emotional distress. To recover under a claim of intentional infliction of emotional distress, a plaintiff must prove that the defendant (1) intentionally or recklessly (2) engaged in extreme and outrageous conduct (3) causing (4) severe emotional distress to the plaintiff. *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)). Proving the requirements of the tort is rigorous. *Id.*

The basis for the tort is the intent to harm someone emotionally. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). A defendant's conduct must be so extreme and outrageous as to be "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999) (citing Restatement (Second) of Torts § 46). Extreme and outrageous conduct could arise from the actor's abuse of a position of authority over the plaintiff. Restatement (Second) of Torts § 46 cmt. b (1965). However, "name-calling . . . and even verbal exchanges in threatening tones are . . . not actionable conduct in almost any environment." *Winchester*

*v. Allison Transmission/GMC*, No. 1:04-CV-1153, 2006 U.S. Dist. LEXIS 59955, at *6 (S.D. Aug. 26, 2006).

Furthermore, the plaintiff must suffer a level of emotional distress that no reasonable person could be expected to endure. Restatement (Second) of Torts § 46 cmt. j (1965). The "requirement implies more than a person being angered, offended, appalled, or even shocked. It connotes an emotional condition that threatens an individual's mental health." *Winchester*, 2006 U.S. Dist. LEXIS 59955, at *5. For example, in *Priest v. Brummer*, No. 1:06-CV-065, 2008 WL 2788759 (N.D. Ind. July 18, 2008), the defendant sexually harassed his coworker, the plaintiff. As a result, the plaintiff suffered emotional distress manifesting itself in the form of ongoing nightmares, daily headaches, trouble breathing, heart racing, panic and anxiety, weight loss, vomiting, and crying. The symptoms continued after the plaintiff left her employment with the defendant. The court concluded that the plaintiff's emotional distress was severe and supported a claim for intentional infliction of emotional distress. *Id.* at 8.

Given the persistent verbal abuse that Plaintiff alleges she suffered at the will of Campoy, a reasonable jury could conclude that Campoy engaged in extreme and outrageous conduct. This conclusion is supported by the fact that Campoy was in an authoritative position over Plaintiff—a position that a reasonable jury could find she abused. Campoy's conduct was at times sexual and often threatening and demeaning. It occurred in Plaintiff's workplace and in the presence of her coworkers.

However, Plaintiff has failed to make a sufficient showing that Campoy caused her severe emotional distress. According to Plaintiff, Campoy's verbal abuse humiliated her. Plaintiff states that Campoy made her question herself as a person, her knowledge of

15

the dental industry, and her ability as an employee. Campoy also made Plaintiff cry at work. Plaintiff, although humiliated, has not shown that her mental health has been threatened by Campoy's conduct. Plaintiff has not seen a doctor for mental distress. Aside from crying at work, Plaintiff's emotional distress has not manifested itself in ongoing physical or psychological symptoms such as those suffered by the plaintiff in *Priest*. Indeed, Plaintiff states that Campoy's conduct did not even affect her sales performance. Although the effect of Campoy's conduct on Plaintiff is unfortunate, Plaintiff's distress is not indicative of severe emotional distress actionable under Indiana law.

Therefore, Plaintiff's claim of intentional infliction of emotional distress fails as a matter of law.

**(4)** *Negligent Retention*

Next, Plaintiff argues that TP Orthodontics was negligent in retaining Campoy as an employee. Indiana recognizes the tort of negligent retention of an employee and has adopted the Restatement (Second) of Torts as the standard outlining liability for this tort. *Sandage v. Bd. of Comm'rs of Vanderburgh County*, 897 N.E.2d 507, 511–12 (Ind. Ct. App. 2008). Section 317 of the Restatement provides that a master is "under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm," if (1) the servant is on the master's premises or using the master's chattel and (2) the master knows or has reason to

know that he can control his servant and knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 317 (1965).

In addition, an employer may be liable under a theory of negligent retention "only if he knows the employee is in the habit of misconducting himself in a manner *dangerous* to others." *Briggs v. Finley*, 631 N.E.2d 959, 967 (Ind. Ct. App. 1994) (emphasis added); *see also* Restatement (Second) of Torts § 317 cmt. c (1965). Comment c of § 317 provides an illustration of dangerous conduct, which the section targets: "a railroad company which knows that the crews of its coal trains are in the habit of throwing coal from the cars as they pass along tracks laid through a city street, to the danger of travelers, is subject to liability if it retains the delinquents in its employment . . . ." Restatement (Second) of Torts § 317 cmt. c (1965).

Despite the threatening and hostile nature of Campoy's conduct toward Plaintiff, it was not "dangerous" within the meaning of § 317. Specifically, Plaintiff has not shown that Campoy intended to cause or posed an unreasonable risk of bodily harm to others in the workplace. Therefore, Defendant is entitled to judgment as a matter of law.

**(5)** *Defamation*

Plaintiff's final claim is that Campoy's statement to Heidi Cheslek that Plaintiff "wasn't a good mother" constituted defamation. To recover for defamation, a statement must be both false and defamatory. *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 687 (Ind. 1997) (citing Restatement (Second) of Torts § 558 (1977)). A plaintiff seeking to prove defamation under Indiana law must also establish the following elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4)

damages. *McQueen v. Fayette County Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999) (citing *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992)).

It is well established that "statements that cannot reasonably be interpreted as stating actual facts about an individual" are protected by the First Amendment. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–21 (1990). To be actionable, a statement must be "susceptible of being proved true or false." *See id* at 21.

Campoy's statement to Cheslek that Plaintiff "wasn't a good mother" was Campoy's subjective opinion and one in which reasonable people might disagree (as Cheslek did). As such, Campoy's statement cannot be proved true or false. *See Ireland v. Edwards*, 584 N.W.2d 632, 637 (Mich. Ct. App. 1998) (holding that defendant's statements regarding fitness of mother were necessarily subjective and not actionable); *Webster v. Wilkins*, 456 S.E.2d 699, 701 (Ga. Ct. App. 1995) (holding that defendant's statement that plaintiff was not fit to have a child was not capable of proof or disproof and thus, not actionable). Therefore, Campoy's statement concerning Plaintiff's fitness as a mother is not actionable, and Defendants are entitled to judgment as a matter of law on this claim.

### D. Conclusion

In sum, a genuine issue of material fact precludes the Court from granting summary judgment in favor of Defendant on Plaintiff's Title VII hostile work environment claim. However, Plaintiff has failed to make a sufficient showing of all the elements of her remaining claims to withstand summary judgment. Specifically, Plaintiff cannot maintain her tortious interference claim because Campoy was Plaintiff's

supervisor and acted within the scope of her employment when firing her. Plaintiff also has not shown that she suffered severe emotional distress to maintain her claim for intentional infliction of emotional distress. Finally, Campoy did not engage in dangerous conduct to support Plaintiff's claim for negligent retention, and her statement that Plaintiff "wasn't a good mother" is not actionable under Indiana defamation law.

Therefore, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment (DE 76).

SO ORDERED on July 30, 2009.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE
